**Opinion issued December 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-23-00023-CV**

————————————

**ARROW FIELD SERVICES, LLC, Appellant**

**V.**

**LINDE ENGINEERING NORTH AMERICA, INC., Appellee**

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-89936**

---

## OPINION

In this commercial construction contract dispute, appellant Arrow Field Services, LLC (Arrow) appeals the final judgment rendered on the jury's verdict in favor of appellee Linde Engineering North America, Inc. (Linde) on Linde's claims against Arrow for breach of contract and violation of the Texas Prompt Payment

Act[1] (PPA or the Act) and the awards to Linde of $20,739,741 in damages, $17,683,501 in prejudgment interest, $4,616,760 in attorney's fees, and $130,568 in costs. In five issues, Arrow contends that (1) the PPA does not apply in this case because the Act's "mineral exemption" excludes the parties' agreement and, independently, the PPA does not apply extraterritorially to injuries that occur outside Texas; (2) Linde failed to present legally sufficient evidence that Arrow is liable to Linde for Base Costs exceeding the $124 million that Arrow has already paid; (3) even if the PPA applies to the parties' agreement, the jury's award of $17,683,501 in prejudgment interest to Linde should be reversed based on (a) Linde's uncured defaults or (b) the trial court's acceptance of a post-trial interest calculation unsupported by any jury finding; (4) Linde failed to present legally sufficient evidence that it is entitled to a $729,000 Safety Incentive; and (5) because Linde's PPA claim fails, the final judgment should be modified by deleting the award of attorney's fees and costs and recalculating the prejudgment interest. For the reasons discussed below, we affirm in part, reverse and render in part, and reverse and remand in part the trial court's final judgment.

---

[1] TEX. PROP. CODE §§ 28.001-.010.

2

Arrow is a midstream company located in North Dakota that gathers oil and rich natural gas and processes the natural gas to extract natural gas liquids (NGLs).[2] Linde provides construction, procurement, engineering, and project management services to clients in the oil and gas industries.

*The EPC Agreement*

In April 2018, Arrow and Linde executed a Target Price Agreement for Engineering, Procurement, and Construction (EPC Agreement) for the Bear Den II Plant, in Watford City, North Dakota.[3] Under the EPC Agreement, Arrow hired Linde as the general contractor on the project.[4]

Article 7 of the EPC Agreement, entitled "Total Contract Price and Payments to Contractor," provides in relevant part, as follows:

> **7.1 Total Contract Price.** As compensation in full for the full and complete performance of the Work by Contractor and all of Contractor's other

---

[2] Arrow is a subsidiary of Crestwood Midstream Partners LP. Crestwood was a named defendant in the underlying suit but is not a party to this appeal.

[3] Arrow had an existing plant at the time, the Bear Den I plant. From 2015 to 2017, the natural gas volumes produced by producers and gathered by Arrow in the field near the Bear Den I plant increased but the Bear Den I plant lacked the capacity to meet the increased volume. In 2017, Arrow decided to build the Bear Den II plant, a new, larger natural gas processing plant in the area to accommodate the increased volume.

[4] Although Arrow initially hired Linde to engineer and build a unit of the plant called the "Core-Cryo," which cryogenically freezes natural gas so that natural gas liquids separate out, Arrow later hired Linde as the general contractor for the balance of the plant.

obligations under this Agreement with respect to the Work, Owner shall pay and Contractor shall accept sum of: (a) a Fixed Fee as described in Section 7.1A, adjusted in accordance with the Incentive Plan set forth in Schedule C-3; and (b) Base Costs as described in Section 7.1B (together, the *"Total Contract Price"*).

. . . .

**A.** *Fixed Fee*. Owner shall pay Contractor a fixed fee as further defined in Schedule C-1 (*"Fixed Fee"*), subject to adjustment in accordance with the Incentive Plan set forth in Schedule C-3. The Fixed Fee shall be payable in each Invoice, with each such payment calculated as set forth in Schedule C-1. The Fixed Fee shall not be subject to adjustment except as specified in this Agreement.

**B.** *Base Costs*. Owner shall pay Contractor those costs, charges and expenses incurred by Contractor in the performance of the Work payable as *"Base Costs"* as defined in Schedule C-1. Base Costs shall be net of any interest, commission, offset credits, rebates or other direct or indirect payment received by Contractor from third parties incident to the performance of the Work. Contractor shall remit to Owner any such amounts received.

Section 3.1 of Schedule C-1, "Fixed Fee," provides, in part, as follows:

Owner shall pay Contractor $9,579,980 USD for the satisfactory completion of all Work performed by Contractor (*"Fixed Fee"*). The Fixed Fee shall be inclusive of all profit for the Project, all Subcontractor mark-ups, certain of Contractor's overhead costs, and other costs and expenses of Contractor performing the Work other than the Base Cost and, if applicable, the Incentive Plan Adjustment.

As to Base Costs, Section 5.1 of Schedule C-1 states:

Contractor shall only be entitled to be paid for the Base Cost incurred in the course of carrying out the Work under this Agreement if those disbursements:

    (a)  have been actually, reasonably and properly incurred for the sole purpose of carrying out the Work; and

4

(b) are enumerated as Base Costs in accordance with Schedule C-2 and as further clarified in Table C-1.

Section 5.2 provides that "Owner shall reimburse Contractor as a Base Cost for the actual invoiced cost to Contractor and paid by Contractor to Approved Subcontractors engaged in accordance with Sections 2.3 and 2.4 of the Agreement." These reimbursable Base Costs included "[f]ees and expenses of Subcontractors performing a portion of the Work." In addition, the parties agreed on a list of "Disallowed Costs" which were not reimbursable, including costs resulting from any negligence of Linde.

Schedule C-3A sets forth a "Target Base Cost" for Linde's work of $65,691,533. The Total Base Cost actually incurred by Linde would be compared to the Target Base Cost to determine the "Cost Adjustment Factor," i.e., whether the Fixed Fee would be adjusted upward or downward, and Section 2.3 delineates how the Fixed Fee shall be adjusted. Linde warranted that it could perform the work at the Target Price of $75,271,513 and within the schedule of key dates.[5]

Schedule C-3, Section 3.1, "Safety Incentive Program," provides:

> The Parties agree the following safety incentive program shall apply to the Project: If, upon Final Completion, Contractor and Subcontractors and Sub-subcontractors combined have (i) a Total Recordable Incident Rate of less than or equal to **1.4**, (ii) a Lost Time Case Rate of less than or equal to **0.67**, and (iii) zero fatalities, then the Fixed Fee shall be

---

[5] The "Target Price" is defined as the Target Base Cost ($65,691,533) plus the Fixed Fee ($9,579,980).

5

increased by an amount equal to one percent (1%) of the Target Base Cost.

From April 2018 through August 2019, Arrow paid Linde's monthly invoices in full. A dispute, however, subsequently arose over payments. In August 2019, Arrow stopped paying Linde's invoices and Linde stopped paying its subcontractors. The Bear Den II plant was completed and became commercially operational that same month.

### *Procedural History*

In December 2019, Linde sued Arrow asserting claims for breach of contract, violation of the PPA, and quantum meruit and sought more than $50 million in actual damages based on unpaid Base Costs. Arrow answered and counterclaimed for fraudulent inducement, civil conspiracy to commit fraudulent inducement, and breach of contract. In the course of litigation, Arrow paid Linde $22,736,218 as partial payment for the unpaid Base Costs.

### A. The Trial

Trial began in May 2022 and lasted nearly five weeks. The jury heard testimony from the following witnesses:

#### **Ali Jangi**

Jangi is Linde's Director of Project Execution. He testified that, prior to being hired to build the Bear Den II plant, Linde had built six other gas processing plants. He testified that Arrow initially hired Linde to build the Core-Cryo, which is the

heart of the plant, and that Kahuna was the general contractor on the project. However, when Arrow became concerned about Kahuna's engineering competency and its ability to meet the scheduling requirements of the project, Crestwood approached Linde about taking over the work on the balance of the plant. Linde accepted the job.

Jangi testified that the Bear Den II project was different from the other plants Linde had previously built in several ways. He testified that, in contrast to the Bear Den II project, the other projects did not involve Linde replacing a previous general contractor, they were not "fast-track" projects, they did not require substantial changes, and the contracts for the other projects were all lump sum contracts as opposed to a cost reimbursable contract.

In his role as Director of Project Execution, Jangi reviewed the status of the Bear Den II project monthly with the execution team in Linde's Tulsa office. Jangi testified that Crestwood asked for significant changes to be made to the project, "literally every day new things," and that Crestwood caused delay in finalizing portions of the project which, in turn, affected Linde's ability to proceed with the engineering work and maintain the project schedule.[6] He testified that Crestwood

---

[6]     Jangi testified that Crestwood had back-and-forth discussions with Linde about the electrical portion of the project, i.e., the "brain and nerve" of the plant, that lasted eight to ten weeks, and that such a delay can impact the overall delivery of the product.

7

told Linde to do what it asked and that Crestwood would reimburse Linde for the work. Jangi testified he became more engaged in the execution of the project as problems and issues arose.

Jangi testified that in accordance with the payment terms under the parties' contract, Linde submitted an invoice to Crestwood each month with supporting back-up documentation in order to be reimbursed for, among other things, the man-hours spent by the engineering group, the purchase of materials and equipment, and payments made to subcontractors. Jangi stated that Linde internally reviewed the documentation and then reviewed it with Crestwood before submitting the invoice for payment. He testified that if a mistake in an invoice occurred, Linde discussed it with Crestwood and made modifications or corrections, when necessary. He stated that, in general, Crestwood had no major objections to any of Linde's invoices and that Crestwood paid all of Linde's invoices from the start date of the project in April 2018 until August 2019.

Jangi testified that the Fixed Fee in Article 7.1A of the contract consisted mainly of the profit that Linde would earn from the project. The Fixed Fee was set

---

In his deposition testimony admitted at trial, James Sloan, one of Linde's lead project managers on the Bear Den II project, testified that the plant that was ultimately built was different that the plant whose target price was $75 million in the EPC contract, characterizing them as "two different projects." According to Sloan, the plant that Linde built was spread out and likely covered twice the surface area of the original plant.

forth in Section 3.1 of Schedule C-1: "Owner shall pay Contractor $9,579,980 USD for the satisfactory completion of all Work performed by Contractor." Jangi testified that Linde did not receive the entire $9.5 million of the Fixed Fee. Jangi stated that the Base Cost under Article 7.1B of the contract refers to the actual cost incurred by Linde: "Owner shall pay Contractor those costs, charges and expenses incurred by Contractor in the performance of the Work payable as *"Base Costs"* as defined in Schedule C-1." Under Section 5.2 of Schedule C-1, subcontractor costs are reimbursable Base Costs: "Owner shall reimburse Contractor as a Base Cost for the actual invoiced cost to Contractor and paid by Contractor to Approved Subcontractors engaged in accordance with Sections 2.3 and 2.4 of the Agreement." Jangi testified that Bilfinger Westcon (Westcon), the primary construction contractor, and Ardent, the electrical instrumentation subcontractor for the project, were among Linde's subcontractors on the Bear Den II project.

The contract also defines other terms including "Disallowed Costs" and "Target Price." Jangi testified that the Target Price "was the price that we shoot at," and that at no time did Linde promise Crestwood that the plant would cost $75 million or promise to build the plant for $75 million.

Jangi testified that the Target Base Cost of $65,691,533 could change through the change order process. He explained that each contract Linde enters has an agreed-upon scope of work. He stated that during project execution the client might

9

request changes or a different direction which changes Linde's scope of work on the project. Jangi testified that the Target Base Cost changed during the Bear Den II project.

Jangi also testified that Linde's Fixed Fee could be adjusted upward or downward depending on the Cost Adjustment Factor, which is determined by comparing the Total Base Cost to the Target Base Cost. He explained that under Sections 2.2 and 2.3 of Schedule C-3, if the Total Base Cost, i.e., the actual cost of building the plant, exceeded the Target Base Cost, plus a $1 million deadband,[7] Linde's Fixed Fee would decrease, but if the Total Base Cost was less than the Target Base Cost, minus the $1 million deadband, Linde's Fixed Fee would increase.

Jangi testified that all of Linde's other contracts had been lump sum contracts and that it had never been a party to a reimbursable contract before the Bear Den II project. Jangi explained that "the most important difference between a lump-sum contract and a reimbursable contract is who is carrying the risk." He testified that, in a lump-sum contract, the contractor bears the risk of cost overrun and absorbs any overrun. By contrast, in a reimbursable contract, the risk of cost overrun remains with the client and it is the client who pays for any cost overruns that occur. He

---

[7] Jangi described "deadband" as a "tolerance" on the Base Cost. This means that $1 million over or under the Base Cost was acceptable but exceeding $1 million in either direction would impact Linde's Fixed Fee.

testified that to enter a lump-sum contract, Linde must have an absolute clear scope of work so that it can properly evaluate the risk, come up with a lump-sum number, and determine whether it is willing to take on the risk of cost overrun. Jangi testified that absent a clear scope of work, Linde cannot lock in the numbers and that its only choice is a reimbursable contract. Jangi stated that Linde did not have all the information it needed to propose a lump-sum contract for the Bear Den II plant.[8]

Jangi testified that Linde considered the schedule for construction of the Bear Den II plant "aggressive." He stated that, based on Linde's past experience, gas plants this size normally take about two years to build. However, changes to a project will impact a project's schedule and should be avoided when there is an aggressive schedule in place. Jangi testified that the schedule for the Bear Den II plant was aggressive because it was shorter than the typical two-year schedule to build such a plant and, with the changes that occurred, it became more and more aggressive. Jangi testified that Crestwood made it very clear that keeping to the schedule was more important than the costs and that it needed the plant to be operational by August 2019.

Jangi testified that the Bear Den II plant began commercial operations on August 14, 2019. One month later, on September 20, 2019, Jangi received a letter

---

[8] As an example, Jangi pointed to the fact that Linde did not have a clear understanding of the work that the previous contractor, Kahuna, had completed and whether it was properly performed and aligned with Linde's design.

from Chris McFarland, Crestwood's project manager, advising Linde for the first time that Crestwood intended to withhold payment of Invoice 16 Rev. 1 in the full amount of $31,047,189.23 due to, among other things, Linde's refusal to participate in an audit. Jangi stated that Crestwood never informed Linde that it required an audit of Linde's records as a condition of payment at any time prior to the September 20, 2019 letter. Linde employees remained at the project site in September 2019 and left the site in late October 2019.

Jangi testified that Crestwood paid Linde's invoices from April 2018 through August 2019 in full and that, if Crestwood had stopped paying those invoices, Linde would have stopped its work because the parties' agreement was a cost reimbursable contract. Jangi stated that the costs reflected in its invoices were actually incurred by Linde for the sole purpose of carrying out the work at the Bear Den II plant. He stated that Linde told Crestwood from the beginning of the project that Linde would stop work if Crestwood did not pay its invoices. Jangi also recalled telling Hugo Guerrero, Crestwood's Senior Vice-President of Technical Services, that Linde would stop its work if Arrow stopped paying Linde's invoices.

Jangi testified that he was not aware of any provision in the parties' contract requiring Linde to track disallowed costs and Linde did not track them. He also testified that under Section 12.2 of the EPC Agreement, any rework, i.e., work requiring modification or replacement, was reimbursable while work performed by

12

Linde to correct any defective work prior to mechanical completion was at Linde's expense.

Jangi stated that the Target Price as set forth in the EPC Agreement for the Bear Den II project was $65 million in Base Costs plus a Fixed Fee of $9.5 million but the project ended up costing about $156 million. Jangi testified that the significant cost increase was due mainly to the changes that Crestwood requested. In particular, Jangi pointed to Crestwood's requests that Linde move a control building that had been constructed in the middle of the plant to the top of a hill and that it expand a compressor building and the stabilizer for future expansion. He stated that these change requests had a "huge impact" on the final cost and that the arrangement of the plant, or "plot plan," that was discussed as part of the original scope of work for the balance of the plant "was completely different than what Crestwood got [at the] end of the day."

Jangi created a PowerPoint presentation for Crestwood's project team that showed the status of the project. Guerrero, Arrow Manager Asim Siddiqui, and McFarland attended the meeting. The presentation showed that the original design for the plant upon which Linde's scope of work was based was for "60,000 Square Process Area," but that the design eventually became a "120,000 Square Process Area," increasing the cost of the project from $75 million to $156 million. He said

that the purpose of the presentation was to show Crestwood that the plant it would get was not the plant that was negotiated with Linde in January 2018.

Jangi testified that Crestwood hired Westcon as the mechanical contractor on the project prior to awarding Linde the balance of the plant. Linde and Westcon subsequently executed a T&M (time and materials) reimbursable subcontract under which Westcon was to perform the civil and mechanical work on the project and Linde would reimburse Westcon for its work. Jangi testified that Westcon invoiced Linde under the subcontract which included markups of the subcontracts to cover the indirect costs, i.e., overhead costs, as well as other costs. Jangi testified that, as of September 2018, Crestwood had copies of the subcontract as well as Westcon's invoices and supporting documentation that it submitted to Linde. Jangi testified that the first time Crestwood expressed concern that the Westcon subcontract was inconsistent with Section 2.3 of the EPC Agreement was in September 2019, after the plant was completed.

Linde first learned of Crestwood's request for an audit of its books and records by Veritas Advisory Group (Veritas) in late July 2019. In response, Linde provided more than 30,000 pages of documentation to Veritas. On September 24, 2019, Lane Sharrah, Linde's project manager for the Bear Den II Project, emailed Kenneth Monson, Veritas's Vice-President, ahead of a scheduled meeting to ask whether there were any outstanding items that Veritas had requested but not yet received

14

from Linde. Monson responded that he was not aware of any outstanding items at that time. This email exchange occurred four days after McFarland's September 20 letter to Linde advising that Crestwood would stop paying Linde's invoices because Linde was not cooperating with the audit. Jangi stated that Linde subsequently canceled its meeting with Veritas because Crestwood had already stopped paying Linde and Veritas wanted to interview Linde's employees which was beyond the scope of audit under the EPC Agreement.

Jangi testified that Change Order No. 1 increased the Target Price under the contract by $5,884,324.51. The Change Order, dated April 10, 2019, was signed and approved by McFarland and Arturo Puigbo, Linde's Vice-President of Sales and Technology, Natural Gas. Jangi testified that Change Order No. 1 was the result of an earlier meeting with Crestwood, Linde, Westcon, and Ardent during which there was discussion about how to accelerate the schedule to meet the Target Date. Jangi testified that during the meeting Crestwood assured Linde, Westcon, and Ardent that they would be paid to have the project completed by August 2019. The Change Order reflected that one of the additional costs was due to the subcontractors' employees working night shifts and a 13-1 schedule, i.e., working thirteen consecutive days followed by one day off. Jangi testified that in issuing the Change Order, Crestwood confirmed to Linde that it would adjust the Target Price as well as Linde's Fixed Fee. Crestwood issued Change Order No. 2 which increased the Target Price by $2.1

15

million and the Fixed Fee by $370,000. Similarly, Crestwood issued Change Order Nos. 3 and 4 which likewise increased the Target Price and the Fixed Fee. In all, Crestwood approved Linde's Change Order Nos. 1 through 5 but did not approve Change Order Request Nos. 6 through 19.

Jangi testified that Linde's subcontractors put liens on the plant when they stopped receiving payments from Linde. He stated that Linde subsequently paid the subcontractors, and the liens were removed, even though Crestwood had stopped paying Linde. Jangi testified that even though Crestwood failed to comply with their contractual requirements to pay Linde, Linde paid the subcontractors because it had an obligation to do so under their contract. Jangi recalled that when he mentioned to Guerrero in September or October 2019 that Crestwood failed to comply with its obligations under the EPC Agreement when it stopped paying Linde, Guerrero replied "I got what I wanted. You need to follow up with our legal team." Jangi testified that at the time of trial, Linde had a lien on the property. He stated that Linde did not make any money on its contract with Crestwood.

**Robert Phillips**

Phillips is Crestwood's Chairman of the Board and Chief Executive Officer. Crestwood is the parent company of Arrow and headquartered in Houston and Arrow is a subsidiary of Crestwood with assets located in North Dakota.

The Bear Den gas processing facility is the terminus of the Arrow Gathering System. Phillips testified that Crestwood decided to expand the Bear Den facility in 2017. After selecting Linde as the EPC contractor for the Bear Den II project, Crestwood and Linde entered into a reimbursable contract.

Phillips testified that the EPC contract included specific protections to protect Crestwood and ensure that Linde's costs were actual, reasonable, and proper expenses. He stated that Crestwood's audit rights entitled it to evaluate the subcontractors' costs as well. Phillips testified that Crestwood negotiated for the right to disallow certain costs that they did not think were reasonable or proper.

Phillips testified that one unique feature of the EPC Agreement was that it allowed Crestwood to ensure that Linde hired subcontractors using the same type of contract that it had with Crestwood, i.e., a reimbursable contract. In this way, Crestwood would have the ability to audit all the way through to the subcontractor agreements and ensure that the invoices Linde was sending to Crestwood as charges from their subcontractors were reasonable and proper and in accordance with the project design. Phillips stated that Crestwood later learned that the subcontractors' contracts were not the same type of contract as it had with Linde, and that Crestwood never had the chance to audit those subcontractors.

Phillips testified that he relied on the $75 million Target Price in the EPC Agreement in authorizing Crestwood to enter into the contract. He stated that

Crestwood's internal target date of completion was September 1, 2019. He testified that Crestwood made it clear that it needed the plant completed by this date to begin handling more gas volume and earn more money. He stated that he authorized Crestwood to enter into the EPC Agreement with Linde based on Linde's representation that it could meet that deadline.

Phillips testified that Crestwood continued to pay the invoices but "it was confounding to us that we couldn't get the type of verification or documentation to support the invoices that were coming in." Phillips stated that he told the project controls department to continue calling Linde to request the supporting documents and "find out why the bills are what they are."

According to Phillips, the issue came to a head when it became apparent to Crestwood that the past and future projected cost of the project was going to be nearly double the original estimate. Crestwood began asking Linde why the costs were so high. He testified that while the different project teams were initially open and transparent, Crestwood eventually became less comfortable with Linde's answers, and at times received no answer from Linde. Phillips testified that Linde sometimes indicated that there was a problem with an invoice, and it had to re-invoice or provide a different explanation as to why the costs were so high, but this was never satisfactory to Crestwood.

Phillips testified that, in May or June 2019, he directed the team to inform Linde that Crestwood intended to exercise its audit rights under the contract. Phillips stated that Crestwood continued to try to process the invoices from Linde and pay them, but that it was not satisfied with the explanations Linde provided and it expected Linde to answer its questions or provide the supporting documentation. Phillips testified that the disputes often involved documentation from third-party subcontractors and Linde refused to provide it. He stated that Linde initially cooperated with the audit and provided Crestwood with access to additional documents and to Linde personnel. To ensure that it fully understood what was in the documentation, Crestwood hired its own experts to determine whether the invoices and supporting documentation were reasonable and proper and met the original design of the project. Crestwood's experts and Linde's experts were scheduled to meet in Houston. However, Linde cancelled the meeting the night before and stopped cooperating with the audit.

In a letter dated September 20, 2019, Crestwood advised Linde that Arrow intended to withhold and/or offset the amount set forth in Invoice 16 Rev. 1. The letter stated that after reviewing revised Invoice 16, and considering amounts previously paid to Linde, Arrow was disputing payment in the full amount of $31,047,189.23. The letter noted that at a meeting with Crestwood, Linde representatives admitted that Invoice 15 and original Invoice 16 were incorrect.

Phillips testified that after Crestwood questioned Linde about inconsistent back-up documentation for revised Invoice 16, Linde again admitted that the information was incorrect. The letter stated, in part:

> Given Linde's repeated errors, lack of transparency, and inability to substantiate significant overruns and delays, we have no confidence that Linde is properly accounting for and invoicing its reimbursable costs. This is particularly troubling as Linde's estimated cost to complete the project is now twice the amount we agreed to when Linde was selected for the work and we have had to take significant actions to try and prevent further delays. Linde has not provided adequate support for the significant cost overruns or extensions of time, and the change orders Linde has submitted are not acceptable under the contract.

The letter also stated that Linde had failed to present representatives with sufficient knowledge of the project necessary to respond to the auditors' questions, and that many of the requested documents had yet to be provided despite repeated requests. It stated that the audit revealed that Linde failed to comply with material terms in the agreement which significantly impacted the overall costs of the project. The letter stated:

> Linde's subcontracts are not consistent with the material terms of the Agreement with Linde, in violation of Section 2.3 of the Agreement. While complete documentation has not been forthcoming, we understand that Linde's major subcontracts are not structured on a cost reimbursable basis to account for the actual costs incurred by the subcontractor. Linde's material omission has resulted in the submission of Disallowed Costs for which we have paid but are not responsible . . . .
>
> As a result of Linde's failure to comply with its obligations under the Agreement and failure to properly substantiate its invoices, among other reasons, we have no reasonable alternative than to withhold and

20

offset within our rights pursuant to Section[s] 7.4, 7.5, 7.7 and 7.8 of the Agreement in order to protect Owner from losses arising from Linde's conduct.

Without limitation to any other defects that have been or may be identified, and in support of our good faith basis for withholding and/or offsetting amounts pursuant to the Agreement, we provide the following illustrative list of Linde failures:

- unreasonable engineering delays, errors, and omissions, which have resulted in significant Project delays, additional costs, and other damages to Owner;

- failure to conduct a reasonable inquiry or analysis of the job site resulting in a grossly underestimated bid upon which Owner relied;

- extreme construction inefficiencies;

- unreasonable equipment expenditures resulting from incomplete or negligent design plans, for which a more cost-effective alternative was available;

- rework costs caused by assembly error or construction defects;

- failure to present accurate information on the project schedule and progression of work;

- delay damages incurred by Owner due to Linde's failure to achieve timely Mechanical Completion;

- invoicing of Disallowed Costs incurred by Linde and/or its subcontractors for which Crestwood has tendered payment but is not responsible;
- amounts paid by Owner to Linde in preceding invoicing periods incorrect[] and for which there was insufficient or inaccurate supporting information; and/or

- multiple changes in personnel throughout the Project that have disrupted administration of the Project.

21

The letter concluded that "[a]s a result of the foregoing, Owner intends to withhold payment of Invoice 16 Rev. 1 in its entirety pursuant to Owner's rights and remedies under the terms of the Agreement, at law, and in equity." Phillips acknowledged, however, that he made the decision to stop paying Linde without having read any portion of the EPC Agreement.

On September 30, 2019, Crestwood sent a Notice of Default letter to Linde. The letter stated: "Linde is in Default under Section 15.1 of the Agreement," specifically noting that "Linde's refusal to cooperate with the audit process is an event of Default pursuant to Section 15.1 (iv) of the Agreement" and its "failure to pay amounts owed to subcontractors is another event of Default under Section 15.l(xi) of the Agreement." The letter concluded that "pursuant to Section 15.1 of the Agreement, Linde has seven (7) days to cure these Defaults, and in accordance with Section 7.7 of the Agreement, Owner is not obligated to make any payments that might otherwise be due to Linde unless and until Linde does so."

Phillips stated that, as of October 2019, in addition to Veritas's determination that Linde's invoices to Crestwood included approximately $24 million in disallowed costs, three outstanding issues with Linde remained: (1) a critical piece of equipment in the plant was not working properly, (2) Linde's refusal to renew the letter of credit upon which Crestwood could draw for additional costs or damages incurred by Linde, and (3) Linde's failure to pay the subcontractors and the resulting

22

liens that were filed on Crestwood's property.[9] Philips testified that Crestwood made two additional payments to Linde—one for approximately $19 million and one for $3 million—based upon the reports of Crestwood's experts as to what the reasonable cost of the plant should have been.

## Hugo Guerrero

Hugo Guerrero was Crestwood's Senior Vice-President of Technical Services who oversaw the planning and execution of the Bear Den II project.[10] He testified that Crestwood reimbursed 100% of Linde's costs until the plant went into service in August 2019.

Guerrero testified that staying on schedule to complete the Bear Den II plant was very important to Crestwood because its contract with ONEOK, a midstream gas processing company, was set to expire in August 2019.[11] He testified that the

---

[9]   Jangi testified that Linde paid all the subcontractors in full. He also testified that the missing part Phillips referred to was the center section of an expander-compressor, part of the Core-Cryo unit for which Linde was initially hired. Thus, Linde was not required to provide this part to Crestwood under the EPC Agreement (which was for the balance of the plant work).

[10]  At the time of trial, Guerrero was employed as Senior Vice President at Summit Midstream Partners.

[11]  He testified that the significance of the contract's expiration was that it represented some risk to Crestwood because there was no guarantee that it was going to be able to renegotiate or extend that contract, but Crestwood had the obligation to process that gas from producers. He also testified that at least one of the producers in the Arrow gathering system urged Crestwood to complete the Bear Den II project as quickly as possible.

urgency to get a new contractor in place after Crestwood terminated Kahuna's work on the Bear Den II project and meeting the schedule were factors in Crestwood's decision to hire Linde as its EPC contractor without receiving any other written bids. In accordance with Crestwood's schedule, construction of the Bear Den II plant began in April 2018 and the plant went into service in August 2019.

Guerrero testified that he was involved in negotiating key aspects of the EPC Agreement between Crestwood and Linde, such as the Target Price, the cost reimbursable nature of the agreement, and the warranty provisions. He testified that before executing the EPC Agreement, the parties executed a Letter of Intent (LOI) to allow Linde to begin some of the work and authorize payment so that the work could begin without delay while the two parties negotiated the provisions of the formal EPC Agreement. The LOI stated, among other things, that "Arrow shall pay . . . [Linde's] total, actual cost to complete the work," "[a] Fixed Fee of $9,579,980 . . . subject to adjustment based upon the attainment of the in-service date," and a safety incentive of up to one percent (1%) of the Target Base Cost, subject to achievement of safety metrics.

Guerrero testified that the EPC Agreement between Crestwood and Linde was a Target Price agreement. He testified that Crestwood understood the Target Price as a guarantee that, subject to some adjustments, Linde could deliver the project for that price. However, Guerrero also recalled that, in February 2018, he told Jody

Black, his counterpart at Linde, that the Target Price was "just a target." Guerrero testified that he assured Linde before the contract was executed that all costs would be reimbursed and that it was implied that those costs meant "allowable costs."

As the project progressed into the latter part of 2018, Linde's estimated cost of completion began to increase. Guerrero testified that this increase, as well as keeping to the schedule, concerned Crestwood but it continued paying 100% of Linde's invoices. On July 22, 2018, Guerrero sent an email to Black, Puigbo, and Carlos Conerly that after speaking with Siddiqui he was "very concerned about the direction we are heading in," specifically the lack of progress and delay in execution by Linde. Guerrero sent a letter to Linde on August 21, 2018, in which he formally requested that Linde produce a recovery schedule pursuant to Section 5.5 of the EPC Agreement that explained how Linde intended to regain compliance with the schedule of key dates for the project. In the letter, Guerrero also stated that "[i]n addition to the very significant schedule concerns . . . Arrow has a number of other material concerns with Linde's performance," including that "Linde has failed to maintain any semblance of cost control for the project." Guerrero testified that Conerly told him that Guerrero's letter represented a serious issue for Linde internally and asked if Guerrero could talk to Crestwood management about possibly recalling it. Days later, Crestwood withdrew its demand for a recovery schedule. Guerrero testified that after a series of reviews and analyses, Crestwood management

25

decided to stay with Linde and the subcontractors because that would allow for the best possible outcome on the project.

In 2018, there were multiple discussions between Linde and Crestwood about the Westcon subcontract and how Westcon was charging for its work. Guerrero testified that in the fall of 2018, he reached the conclusion that the Westcon contract violated the EPC contract and created disallowed costs. Guerrero was not aware, however, of any communication by Crestwood in 2018 advising Linde that Crestwood would not reimburse Linde for Westcon's costs.

In an email dated February 5, 2019, Guerrero attached a document entitled "Bear Den Plant 2 Overrun" which he prepared for Crestwood's Board of Directors. In it, Guerrero listed a series of reasons which he determined were causes of the cost overrun Crestwood was experiencing. The document identified, among other reasons, the rising price of raw materials and diesel fuel as factors contributing to increased costs. The document also stated that Crestwood's original estimate of the cost of construction of the plant was prepared without sufficient detail about the scope of the project, and that the timing of the project did not allow Crestwood to solicit bids for the project. The document stated that, "[a]s such, we entered into a Cost Plus Fixed Fee [CPFF] agreement that did not adequately protect Crestwood in the event of a significant cost overrun." Guerrero testified that Crestwood explicitly

26

agreed that Linde would be compensated and that its costs would be reimbursed in connection with its schedule recovery efforts.

Guerrero testified that the Bear Den II Plant began generating revenue as of August 14, 2019. Guerrero stated that other than an issue with some bottom pumps manufactured by another company for which there was a warranty claim, he could not recall any issue that Crestwood experienced with respect to the construction of the Bear Den II Plant.

Guerrero recalled that one of Linde's concerns at the outset of the EPC Agreement was its ability to remain cash-flow neutral. He stated that Linde wanted to make sure that as it made large payments to Westcon and other subcontractors, it would be reimbursed for those payments promptly because it did not want to lose money on a cost reimbursable job. He was aware that Linde paid an enormous amount out of pocket on the project that remained unreimbursed at the time of trial. He agreed that Crestwood eventually got the plant that it bargained for but through its own measures.

Section 1.1 of the EPC Agreement defines "Mechanical Completion" in part as "[t]he project is capable of receiving and processing natural gas in a safe uninterrupted manner 24 hours per day, 7 days per week without further anticipated shutdowns, except for preventive maintenance." Guerrero testified that the Bear Den II plant was not able to operate in a safe manner 24/7 and uninterrupted in August

27

2019. He believed that Crestwood's decision to withhold payment from Linde was reasonable because Linde had overcharged Crestwood by $40 million at the time and it had not produced evidence that those charges were reasonable and allowable in accordance with the contract. He testified that Crestwood did not get the plant it bargained for because the plant was only able to run because his team came in and salvaged it at the end with the help of the subcontractors. He further testified that he relied on Linde's misrepresentations in executing the contract and that Crestwood was defrauded by Linde.

**Chris McFarland**

McFarland was Crestwood's Project Manager on the Bear Den II project. In this role, he was primarily involved in helping to prepare, along with Linde, some of the attachments to the contract such as scope of work, contractor deliverables, and the plot plan.

McFarland disputed that the plot plan at Bear Den II Plant doubled in size from 60,000 sq. ft. to 120,000 sq. ft. McFarland also stated that he had never seen a project change in its cost estimate at completion (EAC) as drastically as the Bear Den II project did. When asked how he would rate Linde's overall performance on the project as compared to other projects he had managed, he testified, "[t]his was unlike anything I had seen. It had no coordination. It was, I mean, frankly a complete disaster from engineering through fabrication, procurement, construction

management, the construction itself, no coordination, communication was not good, there were engineering busts, there w[ere] late deliverables, there were fabrication errors . . . ." He testified that late engineering changes, delays in fabrication and delivery of piping and steel, defects in the piping and steel, and the turnover in key Linde project management personnel resulted in unnecessary costs and schedule impacts to the project. McFarland stated that the accuracy of Linde's cost reports on the project were haphazard at best, inaccurate, and contained frequent errors and omissions. According to McFarland, Crestwood approved all of Linde's change orders that were appropriately supported by documentation.

McFarland testified that due to instability, shutdowns in the plant, and a missing component of the Core-Cryo section, the plant did not achieve "Mechanical Completion" by mid-December 2019. However, he also stated that all major systems at the Bear Den II Plant were mechanically complete on August 1, 2019. McFarland further testified that Crestwood did not receive as-built drawings from Linde within sixty days after Mechanical Completion as required under Section 3.1(a) of the contract, but he acknowledged that Crestwood had refused to certify the Mechanical Completion certificate submitted by Linde for signature. McFarland testified that he did not believe that Linde qualified for a Safety Incentive as provided in the EPC Agreement.

McFarland testified that, in October 2017, before Linde was hired, Crestwood estimated that the Bear Den II project would cost $130 million. He testified that the estimated cost for the full project included the Core-Cryo, Crestwood's own internal labor, and equipment that Crestwood purchased.

Section 2.5D of the contract, under "Contractor Acknowledgements," states in part that "Contractor has investigated to its satisfaction Applicable Law and Applicable Codes and Standards and warrants that it can perform the Work at the Target Price and within the Schedule of Key Dates in accordance with Applicable Law and Applicable Codes and Standards." McFarland agreed that this provision is not a promise by Linde to perform the work at the Target Price but rather it warrants that Linde has reviewed all the applicable law, codes, and standards and believes it can achieve the work to be done for the Target Price. McFarland testified that Target Price is neither a guaranteed price nor a cap on Base Costs. In an August 26, 2018 email from Siddiqui to McFarland, titled "Linde Contract," Siddiqui stated, "[w]e bear all costs," to which McFarland responded, "[w]ell, that sucks but not surprising."

McFarland testified that all major systems at the Bear Den II Plant were mechanically complete on August 1, 2019, and the plant was in full commercial operation by August 14, 2019. McFarland acknowledged that on September 20, 2019—the date that he sent the letter advising Linde that Arrow intended to withhold

30

payment—Crestwood's daily report stated that the plant ran with "no major issues or events."

McFarland testified that Linde met the requirements to receive the Safety Incentive under Schedule C-3, Section 3.1; that is, the total recordable incident rate for the project was less than 1.4, the lost time case rate for the project was zero, and there were zero fatalities at the plant.[12] McFarland testified that 1% of the Target Base Cost under the contract was about $729,000. However, McFarland testified that he did not believe that Linde was entitled to a Safety Incentive because there was no final completion although he acknowledged that final completion could only be reached after mechanical completion was achieved.

## B. The Verdict

At the conclusion of trial, the jury returned a verdict in favor of Linde. The jury found that Arrow breached the EPC Agreement by failing to pay Linde for Base Costs that Linde incurred (Question 1) and that an award of $20,010,362 would compensate Linde for Arrow's failure to pay the unpaid Base Costs (Question 2). It

---

[12] Schedule C-3, Section 3.1 states:

> The Parties agree the following safety incentive program shall apply to the Project: If, upon Final Completion, Contractor and Subcontractors and Sub-subcontractors combined have (i) a Total Recordable Incident Rate of less than or equal to **1.4**, (ii) a Lost Time Case Rate of less than or equal to **0.67,** and (iii) zero fatalities, then the Fixed Fee shall be increased by an amount equal to one percent (1%) of the Target Base Cost.

also found that Arrow failed to promptly pay Linde for an amount allowed to Linde under the EPC Agreement for properly performed work because it did not pay Linde within thirty-five days after Arrow received a written payment request from Linde (Question 3) and that Arrow's failure to promptly pay was not excused (Question 4).[13] Further, the jury found that Arrow violated the EPC Agreement by not paying Linde the Safety Incentive under the EPC Agreement and that $729,379 would compensate Linde for Arrow's failure to pay the Safety Incentive (Questions 6 and 7). And, the jury found that Linde did not fail to comply with the EPC Agreement in any of three enumerated ways (Question 8).[14] Linde moved for entry of judgment.

---

[13]    Question 4 states:

Arrow's failure to promptly pay is excused if—

> 1. Arrow disputed in good faith its obligation to pay or the amount of payment, and

> 2. Arrow withheld no more than 100 percent of the difference between the amount Linde claims is due and the amount that Arrow claims is due.

A good-faith dispute includes a dispute regarding whether the work was performed in a proper manner.

[14]    Question 8 asked:

Did Linde fail to comply with the EPC Contract in any of the following ways?

> (a) Did Linde fail to comply with the obligation to "perform the Work in accordance with GECP [Good Engineering and Construction Practices]" in Section 3.1 of the EPC Agreement?

> (b) Did Linde fail to comply with the Subcontracts provisions in Section 2.3 or 2.4(F) of the EPC Agreement?

Following the jury's verdict, the parties briefed the applicability of Section 28.010 of the Texas Prompt Payment Act and whether the Act's exemption for "mineral development and oilfield services" contained in that section precluded entry of judgment in favor of Linde on its Prompt Payment Act claim. The trial court concluded that the mineral development exemption did not apply.

The trial court signed the final judgment on October 24, 2022, ordering that Arrow take nothing from Linde and that Linde recover the following from Arrow:

a. Actual damages in the amount of $20,010,362.

b. Actual damages caused by Arrow's failure to comply with the EPC Agreement by not paying Linde the Safety Incentive set out in Section 3.1 of Schedule C-3 of the Agreement in the amount of $729,379.

c. Interest under the Texas Prompt Payment Act in the amount of $17,683,501 as of October 24, 2022.

d. Reasonable and necessary attorneys' fees in the amount of $4,616,760.

e. Costs in the amount of $130,568.

f. Post-judgment interest at the rate of 8.25% per annum pursuant to Texas Finance Code § 304.002 and EPC Contract § 7.9, compounded annually on the sum of $20,739,741 from the date of judgment until paid.

g. Post-judgment interest at the rate of 6.25% per annum pursuant to Texas Finance Code § 304.003 compounded annually on the sum of $22,430,829 from the date of judgment until paid.

---

(c) Did Linde fail to comply with the requirement to provide CPM [Critical Path Method] Schedule submissions in accordance with Section 5.4(a) of the EPC Agreement?

33

Arrow moved for judgment notwithstanding the verdict, for a new trial, and to modify the judgment. The motions were overruled by operation of law. This appeal followed.[15]

## Applicability of the Texas Prompt Payment Act

Arrow contends that the Texas Prompt Payment Act does not apply to the EPC Agreement in two ways. First, it argues that the Act's "mineral exemption" unambiguously excludes the parties' agreement. Second, it asserts that the Act does not apply extraterritorially to injuries that occur outside Texas. Linde responds that this case involves a construction contract for a manufacturing facility and is not one of the three types of agreements to which the "mineral exemption" applies. It further contends that there is no bar on "extraterritorial" application of Texas statutes—here, the Prompt Payment Act—under choice-of-law clauses.[16]

### A. Texas Prompt Payment Act

The Texas Prompt Payment Act provides, in relevant part, as follows:

(a) If an owner or a person authorized to act on behalf of the owner receives a written payment request from a contractor for an amount that is allowed to the contractor under the contract for properly performed work or suitably stored or specially fabricated materials, the owner shall pay the amount to the contractor, less any amount withheld as

---

[15]    In its brief, Arrow states that it does not seek a new trial and therefore limits its requests for relief to reversal and rendition or reformation.

[16]    The parties have not cited and research has not revealed an opinion in which a Texas appellate court has construed Section 28.010 of the PPA.

34

authorized by statute, not later than the 35th day after the date the owner receives the request.

TEX. PROP. CODE § 28.002. Section 28.010 provides an exemption from the Act for

"Mineral Development and Oilfield Services":

(a) This chapter does not apply to any agreement:

(1) to explore, produce, or develop oil, natural gas, natural gas liquids, synthetic gas, sulphur, ore, or other mineral substances, including any lease or royalty agreement, joint interest agreement, production or production-related agreement, operating agreement, farmout agreement, area of mutual interest agreement, or other related agreement;

(2) for any well or mine services; or

(3) to purchase, sell, gather, store, or transport oil, natural gas, natural gas liquids, synthetic gas, or other hydrocarbon substances by pipeline or by a fixed, associated facility.

(b) In this section:

(1) "Agreement" includes a written or oral agreement or understanding:

(A) to provide work or services, including any construction, operating, repair, or maintenance services; or

(B) to perform a part of the services covered by Paragraph (A) or an act collateral to those services, including furnishing or renting equipment, incidental transportation, or other goods and services furnished in connection with those services.

(2) "Well or mine services" includes:

(A) drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, purchasing, gathering, storing, or transporting oil or natural gas, brine water, fresh water, produced water, condensate, petroleum products, or other liquid commodities, or otherwise rendering services in connection with a well drilled to produce or dispose of oil, gas, or other minerals or water; and

(B) designing, excavating, constructing, improving, or otherwise rendering services in connection with an oil, gas, or other mineral production platform or facility, mine shaft, drift, or other structure intended directly for use in exploring for or producing a mineral.

*Id.* § 28.010.

Section 28.004, "Interest on Overdue Payment," states:

(a)    An unpaid amount required under this chapter begins to accrue interest on the day after the date on which the payment becomes due.

(b)    An unpaid amount bears interest at the rate of 1½ percent each month.

(c)    Interest on an unpaid amount stops accruing under this section on the earlier of:

   (1)    the date of delivery;

   (2)    the date of mailing, if payment is mailed and delivery occurs within three days; or

   (3)    the date a judgment is entered in an action brought under this chapter.

*Id*. § 28.004. Finally, Section 28.005(b) provides that "[i]n an action brought under this chapter, the court may award costs and reasonable attorney's fees as the court determines equitable and just. *Id*. § 28.005.

## B. Rules of Statutory Construction

In Texas, statutes must be strictly construed according to their plain language, which is "the most reliable guide to the Legislature's intent." *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022) (quoted citation omitted); *see also Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999) ("stray[ing] from the plain language of a statute… risk[s] encroaching on the Legislature's function to decide what the law should be"). Statutory terms "bear their common, ordinary meaning, unless the text provides a different meaning or the common meaning leads to an absurd result." *Miles*, 647 S.W.3d at 619 (quoted citation omitted). Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." TEX. GOV'T CODE § 311.011(b); *see Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344, 348 (Tex. 1979) ("[A] statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will carry out and the other defeat such manifest object, it should receive the former construction.").

## C. "Exemption for Mineral Development and Oilfield Services"

Arrow contends that subsections (a)(1) and (a)(3) of Section 28.010 of the Act apply as a matter of law to the EPC Agreement. Thus, it argues, the Agreement satisfies the mineral exemption, and the Act does not apply. We examine each subsection below.

### 1. Subsection (a)(1)

This subsection states that the PPA does not apply to any agreement:

> (1) to explore, produce, or develop oil, natural gas, natural gas liquids, synthetic gas, sulphur, ore, or other mineral substances, including any lease or royalty agreement, joint interest agreement, production or production-related agreement, operating agreement, farmout agreement, area of mutual interest agreement, or other related agreement.

TEX. PROP. CODE § 28.010(a)(1). "Agreement" includes a written or oral agreement or understanding . . . to provide work or services, including any construction, operating, repair, or maintenance services[.]" *Id*. § 28.010(b)(1)(A).

It is undisputed that the EPC Agreement is a written agreement to provide construction services. Arrow contends that because the Bear Den II plant "produces NGLs" and "develops natural gas and NGLs through its gas processing operations," Linde's construction services were secured, in part, to produce and develop natural gas or natural gas liquids. Thus, it concludes, the Agreement satisfies subsection (a)(1) because it is "a written agreement to provide construction services to produce or develop natural gas or natural gas liquids."

When the PPA was enacted in 1999, the verb "produce" was defined as "[t]o bring into existence; to create" and "to bring (oil, etc.) to the surface of the earth." *Produce*, BLACK'S LAW DICTIONARY 1225 (7th ed. 1999). Prior to that, "produce" was defined as "[t]o make, originate, or yield, as gasoline" and "[t]o bring to the surface, as oil," reflecting that usage of the term existed in the oil and gas field. *See Produce*, BLACK'S LAW DICTIONARY 1225 (6th ed. 1990); *see also Produce*, THE AM. HERITAGE DICTIONARY 660 (3rd College ed. 1994) (defining "produce" as "[t]o bring forth; yield," "[t]o create by mental or physical effort," and "[t]o manufacture"). The Texas Supreme Court has used the term "produce" with respect to NGLs, explaining that "processing plants employ compression, refrigeration, and other processes to remove water and other contaminants and to produce gas liquids." *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp*., 294 S.W.3d 164, 166 (Tex. 2009). Similarly, The Department of Energy has recognized that NGLs are produced through this process, noting that "NGL production happens at natural gas processing plants . . . ." U.S. Dep't of Energy, *Natural Gas Liquids Primer* 5 (June 2018).[17]

The evidence presented at trial demonstrates that the Bear Den II plant is a natural gas processing facility that produces NGLs. Arrow CEO Phillips testified

---

[17]    https://www.energy.gov/sites/prod/files/2018/07/f54/NGL_Primer.pdf (last viewed December 10, 2024). The Texas Supreme Court cited the 2018 edition of the DOE *Primer* in *Hlavinka v. HSC Pipeline Partnership, LLC*, 650 S.W.3d 483 (Tex. 2022).

that the Bear Den II plant uses cryogenic technology to freeze the gas stream to allow the extraction of NGLs (e.g., propane, butane, natural gasoline). Jangi described the cryogenic process as the separation of the different components of natural gas that come out of the wells. Guerrero testified that the raw gas from the wells is taken through a gathering network into the Bear Den II plant which super cools the gas allowing the heavier components of the gas ring to fall out of the gas in liquid form. McFarland stated that high pressure natural gas goes through various temperature and pressure changes at the Bear Den II plant causing liquids to drop out which are then exposed to very cold temperatures in the Core-Cryo facility.

The evidence also shows that the Bear Den II plant "develops" natural gas and NGLs through its gas processing operations. "Develop" in this context is defined as "to make more available or effective: *develop natural resources*." *Develop*, THE AM. HERITAGE DICTIONARY at 389.[18] "The word 'develop' as used in the oil and gas industry contemplates any step taken in the search for, capture, production and marketing of hydrocarbons." Howard R. Williams & Charles J. Meyers, MANUAL OF OIL AND GAS TERMS at 260 (15th ed. 2012). Several witnesses testified that the Bear Den II plant was built to ensure adequate processing capacity to meet the

---

[18]     *See also* www.merriam-webster.com/dictionary/develop (defining "develop" as "to make available or usable: *develop* natural resources") (last viewed December 10, 2024).

increasing natural gas volume. Construction of the plant is a step in the production

of natural gas and NGLs and their development as distinct, marketable products.[19]

The EPC Agreement satisfies the mineral exemption because it constitutes a

written agreement to provide construction services to produce or develop natural gas

or natural gas liquids. *See* TEX. PROP. CODE § 28.010(a)(1), (b)(1)(A). Because the

EPC Agreement falls within subsection (a)(1), the PPA does not apply.

## 2. Subsection (a)(3)

Subsection (a)(3) states that the PPA does not apply to any agreement:

. . . .

> (1) to purchase, sell, gather, store, or transport oil, natural gas, natural gas liquids, synthetic gas, or other hydrocarbon substances by pipeline or by a fixed, associated facility.

TEX. PROP. CODE § 28.010(a)(3). Arrow contends that the EPC Agreement

separately satisfies the mineral exemption under subsection (a)(3) because it "is a

written agreement to provide construction services to gather, store, or transport

---

[19] Jangi explained that each of the components separated out during the cryogenic process has different values and that companies want the more valuable components separated from lower value components so that they can be sold at different prices. Phillips testified that the Arrow system gathers oil and rich natural gas and processes it through the cryogenic technology to extract NGLs from the dry gas thereby creating marketable products.

natural gas [or] natural gas liquids by pipeline or by a fixed, associated facility."[20] *See* TEX. PROP. CODE § 28.010(a)(3), (b)(1)(A).

As noted above, there is no dispute that the EPC Agreement is a written agreement to provide construction services. Both Arrow's and Linde's witnesses testified that the plant has an inlet pipeline through which raw gas first enters, the raw gas is then processed and the NGLs are extracted, and the dry gas and NGLs are distributed via separate pipelines. The evidence shows that the Bear Den II plant is "a fixed, associated facility" that includes pipelines.

The ordinary meaning of "gather" is "[t]o cause to come together; convene" and "[t]o accumulate gradually; amass." *Gather*, THE AM. HERITAGE DICTIONARY at 550.[21] "Gathering" in the oil and gas context is defined as "the collecting of gas from various wells and bringing it by separate and several individual lines to a central point where it is delivered into a single line." MANUAL OF OIL AND GAS TERMS at 260. A processing plant may be the designated "central point": "A gathering system generally consists of 'interconnected subterranean natural gas pipelines and related compression facilities that collect the raw gas from wells and deliver it to a central point, such as a processing plant.'" *Id.* at 435. Notably, the

---

[20]    Under Section 28.010(a), a party need only show that subsection (a)(1), (a)(2), or (a)(3) applies to satisfy the mineral exemption. *See* TEX. PROP. CODE § 28.010(a).

[21]    *See also* www.meriam-webster.com/dictionary/gather (defining "gather" as "to bring together") (last viewed December 10, 2024).

Texas Supreme Court recently approved this definition of a "gathering system." *Nettye Engler Energy, LP v. BlueStone Natural Res. II, LLC*, 639 S.W.3d 682, 692 (Tex. 2022) (quoting MANUAL OF OIL AND GAS TERMS).

The evidence shows that the Bear Den II plant is "the terminus of the Arrow Gathering System" which "gathers oil, rich gas, and produce[s] water." Phillips testified that the purpose of the plant expansion was to ensure adequate processing capacity to enable Arrow to gather the gas, extract the liquids, and place them in the downstream pipeline. The EPC Agreement constitutes a written agreement for construction services secured, in part, to "gather" natural gas by pipeline or by a fixed associated facility.

Similarly, the Bear Den II plant was constructed in part to "store" natural gas and NGLs. "Store" is defined as "[t]o keep (goods, etc.) in safekeeping for future delivery in an unchanged condition." *Store*, BLACK'S LAW DICTIONARY at 1432; *Store*, THE AM. HERITAGE DICTIONARY at 1201 (defining "store" as "[t]o reserve or put away for future use, "[t]o fill, supply, or stock, "[t]o deposit or receive in a storehouse or warehouse for safekeeping"). McFarland testified that the Bear Den II plant provides storage of NGLs "in the tanks." The Agreement constitutes a written

agreement for construction services to, in part, "store" natural gas and NGLs by a fixed, associated facility.[22]

Lastly, the Bear Den II plant was also constructed, in part, to "transport" natural gas and NGLs. "Transport" means "[t]o carry or convey (a thing) from one place to another." *Transport*, BLACK'S LAW DICTIONARY at 1505; *Transport*, THE AM. HERITAGE DICTIONARY at 1288 (defining "transport" as "[t]o carry from one place to another; convey.").[23] In the natural gas context, "'transportation' involves the movement of gas through a pipeline's principal transmission system." MANUAL OF OIL AND GAS TERMS at 1082. Under the EPC Agreement, Linde certified that the Bear Den II plant was "capable of receiving and transporting natural gas in a safe and uninterrupted manner . . . ." The EPC Agreement is a written agreement for construction services to, in part, "transport" natural gas by pipeline or a fixed, associated facility.

The EPC Agreement thus satisfies the mineral exemption because it constitutes a "written agreement to provide construction services to gather, store, or transport natural gas [or] natural gas liquids by pipeline or by a fixed, associated

---

22    At trial, Linde acknowledged that the Bear Den II plant stores NGLs but argued that their storage was only "incidental" to their processing. The mineral exemption, however, evinces no requirement that their storage be the agreement's primary activity. *See* TEX. PROP. CODE § 28.010(a)(3).

23    *See also* www.merriam-webster.com/dictionary/gather (defining "transport" as "to transfer or convey from one place to another") (last viewed December 10, 2024).

facility." *See* TEX. PROP. CODE § 28.010(a)(3), (b)(1)(A). Because the EPC Agreement falls within subsection (a)(3), the PPA does not apply. Accordingly, we sustain Arrow's first issue.[24]

## Legal Sufficiency Challenge

In its second issue, Arrow contends that Linde failed to present legally sufficient evidence that Arrow is liable to Linde for Base Costs beyond the $124 million that Arrow has already paid. Arrow argues that conclusive evidence establishes that Linde defaulted on its contractual obligations and that Linde engaged subcontractors in violation of the EPC Agreement. It also argues that Linde is not entitled to its unpaid Base Costs because it offered no reliable, non-conclusory evidence that unpaid Base Costs were "reasonably and properly incurred for the sole purpose of carrying out the Work."

Linde responds that Arrow failed to carry its burden to establish by conclusive evidence that its failure to pay Linde's Base Costs was excused because Linde was in default under the contract and Linde's subcontracts violated the EPC Agreement. It further argues that Arrow's assertion that there is no evidence that Linde's Base Costs were reasonably and properly incurred for the sole purpose of carrying out its

---

[24] In light of our conclusion that the mineral exemption excludes the EPC Agreement from the Act, we do not reach Arrow's additional argument that the PPA does not apply to extraterritorial injuries. *See* TEX. R. APP P. 47.1.

work, i.e., the furthering of the Bear Den II plant's construction, is refuted by the evidence in the record.

## A. Standard of Review

In conducting a legal sufficiency review, we view the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). We must credit evidence favorable to the verdict if reasonable jurors could, disregard contrary evidence unless reasonable jurors could not, and reverse the jury's determination only if the evidence presented at trial would not enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

We may sustain a legal sufficiency, or no-evidence, point if the record reveals one of the following: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence established conclusively the opposite of the vital fact. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). If more than a scintilla of evidence exists, it is legally sufficient. *Lee Lewis Constr.*, 70 S.W.3d at 782. More than a scintilla of evidence exists if the evidence furnishes

46

some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Id*. at 782–83.

When a party "attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). For a party to conclusively establish a fact, "the evidence must leave no room for ordinary minds to differ as to the conclusion to be drawn from it." *Cath. Diocese of El Paso v. Porter*, 622 S.W.3d 824, 834 (Tex. 2021) (quotation omitted). Jurors "are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

### B. Analysis

Arrow contends there are three reasons to reverse and render a take-nothing judgment on Linde's breach of contract claim for unpaid Base Costs: (1) conclusive evidence establishes that Linde is in default of its contractual obligations so it is not entitled to payment of any unpaid Base Costs; (2) conclusive evidence establishes that Linde engaged subcontractors in violation of the EPC Agreement so Linde is not entitled to any payment for its fees; and (3) Linde offered no reliable, non-conclusory evidence that unpaid Base Costs were "reasonably and properly incurred for the sole purpose of carrying out the Work."

47

## 1. Default

Linde's breach of contract claim and Arrow's counterclaims and affirmative defense of Linde's prior material breach were submitted to the jury in Questions 1 and 8 of the charge. Question 1 of the jury charge (Linde's breach of contract claim) asked whether Arrow failed to comply with the EPC Agreement by failing to pay Linde for Base Costs that Linde incurred. The jury answered "yes." Question 8—which contained both Arrow's counterclaim and its affirmative defense of prior breach—asked whether Linde failed to comply with certain provisions of the EPC Agreement.[25] The jury answered "no."

In support of its argument that Linde's own breaches entitled Arrow to withhold payment, Arrow points to Sections 7.7 and 15.1 of the EPC Agreement. Section 7.7 provides:

> **Payments During Default**. Owner shall not be obligated to make any payments hereunder or release any payments disputed or withheld, at

---

[25] Question 8 asked:

> Did Linde fail to comply with the EPC Contract in any of the following ways?
>
> (a) Did Linde fail to comply with the obligation to "perform the Work in accordance with "GECP" in Section 3.1 of the EPC Agreement?
>
> (b) Did Linde fail to comply with the Subcontracts provisions in Section 2.3 or 2.4(F) of the EPC Agreement?
>
> (c) Did Linde fail to comply with the requirement to provide CPM Schedule submissions in accordance with Section 5.4(a) of the EPC Agreement?

any time in which (i) a Contractor Default shall have occurred and is continuing, or (ii) an event has occurred which, with the passage of time, will constitute a Contractor Default.

Section 15.1 lists certain acts or omissions which constitute "defaults": "If Contractor shall at any time . . . (iii) abandon the project; (iv) repudiate any of its obligations under this Agreement; . . . (viii) fail to discharge liens filed by any Subcontractor or Sub-subcontractor as required under this Agreement; [or] (xi) fail to make payment to Subcontractors for labor or Equipment owed in accordance with the respective Subcontracts . . . ."

Arrow argues that the evidence conclusively establishes that Linde defaulted under the EPC Agreement in the following three ways: (1) it stopped paying its subcontractors, (2) it allowed the subcontractors to file liens on the property, and (3) it abandoned the project and repudiated its obligations.[26]

### a. Payment to Subcontractors

Arrow argues that the evidence shows that Linde became worried that Arrow would stop paying its invoices and decided to stop paying its subcontractors as a preemptive strike. It asserts that the issue came to a head when Linde submitted its Rev. Invoice 16 for $31 million on September 5, 2019. This revised invoice is the first time Arrow stopped payment. It further argues that even if Invoice 16 Rev. 1

---

[26] The record shows that by the time of trial, Linde had paid its subcontractors in full and all subcontractor liens on the plant had been removed.

was valid, Arrow did not have to pay Linde until September 20, 2019, at the earliest, but that Linde had already stopped paying its subcontractors by that time.

Arrow argues that it urged Linde to pay the subcontractors and that it only decided to withhold payment after Linde had already stopped paying its subcontractors, and that Linde's actions forced Arrow to send a Notice of Default on September 30, 2019. Arrow argues that because the unpaid invoices postdate Linde's decision to halt payment to its subcontractors, Arrow was entitled to withhold payment under Section 7.7 of the EPC Agreement during this period of default.

Linde contends that Arrow has not conclusively established that Linde was in default and that it had materially breached the Agreement when Arrow stopped paying Linde's invoices in 2019. It argues that the record shows that these alleged defaults are post-hoc justifications offered now for Arrow's decision to withhold payment in 2019.

With regard to Arrow's assertion that Linde defaulted by not paying its subcontractors, we note that there is no mention in McFarland's September 20, 2019 withholding letter of Linde's non-payment of its subcontractors as a reason for withholding payment from Linde. At trial, Arrow CEO Phillips testified that when he made the decision to stop paying Linde in 2019, he did so without having read any portion of the EPC Agreement. Further, Phillips testified that the reason Arrow

decided to stop paying Linde was that Linde was not cooperating with the Veritas audit.

### b. Subcontractors' Liens

Arrow argues that by the time Linde decided to pay the subcontractors, Ardent and Westcon had filed liens on the Bear Den II plant and that Linde's failure to remove them constituted a default under the Agreement.

Section 16.5 of the EPC Agreement provides:

> **Lien Indemnification.** SHOULD ANY SUBCONTRACTOR OR SUB-SUBCONTRACTOR OR ANY OTHER PERSON ACTING THROUGH OR UNDER CONTRACTOR OR ANY SUBCONTRACTOR OR SUB-SUBCONTRACTOR FILE A LIEN OR OTHER ENCUMBRANCE AGAINST ALL OR ANY PORTION OF THE WORK, THE SITE OR THE PROJECT, CONTRACTOR SHALL, AT ITS SOLE COST AND EXPENSE, REMOVE AND DISCHARGE, BY PAYMENT, BOND OR OTHERWISE, SUCH LIEN OR ENCUMBRANCE WITHIN TEN (10) DAYS OF THE FILING OF SUCH LIEN OR ENCUMBRANCE.

A contractor's failure to discharge a lien filed by a subcontractor or sub-subcontractor constitutes a default under Section 15.1.

Arrow argues that despite its obligation to remove the liens, Linde allowed the liens to remain until at least August 2020, and that Westcon's lien was only released on October 1, 2020. Arrow argues that Linde continued billing Arrow and sent its last disputed invoice (Invoice 24) on August 19, 2020, long before Westcon's lien was removed. Arrow asserts that Section 7.7 permitted it to withhold payment during this default.

Linde responds that its alleged default in allowing subcontractors to file liens against the plant had not yet occurred when Arrow sent Linde its withholding letter in September 2019 listing the reasons for its withholding payment. Indeed, the record shows that Ardent recorded a $5.7 million lien on October 22, 2019, and Westcon recorded a $17.1 million lien on November 1, 2019, after the September 20, 2019 withholding letter. There is also no mention of subcontractors' liens in the September 30, 2019 Notice of Default letter to Linde.

### c. *Abandonment of Project*

Arrow argues that Linde defaulted when it abandoned the project and repudiated its obligations. In support of its argument, it points to Jangi's letter dated October 9, 2019 to Arrow, stating that "[i]n accordance with Article 15.4 of the Target Price Agreement (Agreement) between Linde Engineering North America Inc. (LENA) and Arrow Field Services, LLC (Arrow Field or Owner), LENA gives written notice that it intends to suspend work on the Bear Den Plant 2 project due to Owner's failure to pay undisputed amounts due and owing to LENA . . .and [t]he suspension will continue until Arrow Field has paid LENA undisputed amounts owed under the Agreement." Arrow also points to Jangi's testimony that Linde demobilized from the site in late October or November 2019. It asserts that despite Linde's position that the plant was operational when it left, Linde had other duties including the duty to deliver as-built drawings to Arrow, which it did not do. Arrow

52

contends that this evidence conclusively establishes that Linde abandoned the project and repudiated its obligations, both of which constitute a default under the contract.

The record shows that Linde's alleged abandonment of the project had not occurred when Arrow sent its withholding letter. Jangi's letter advising Arrow that Linde intended to suspend its work, on which Arrow relies, is dated October 9, 2019, which is after the September 20 withholding letter. As to the as-built drawings, McFarland testified that Linde did not provide the drawings within sixty days after Mechanical Completion as required under Section 3.1(a) of the contract. However, he also acknowledged that Crestwood had refused to certify the Mechanical Completion certificate submitted by Linde for signature. As to Arrow's assertion that Linde abandoned the project before it was complete, Jangi testified that "Mechanical Completion" meant that the Bear Den II plant was ready to be commercially operated and it is undisputed that the plant began commercial operations at the latest by August 14, 2019.

Linde also argues that even if it had committed an event of default, Arrow was required under Section 15.1(A) to send Linde "written notice . . . specifying the general nature of the Default." When Arrow sent its withholding letter on September 20, 2019, it had not provided Linde written notice stating that Linde had defaulted by failing to pay subcontractors. And the other two events of default alleged by

53

Arrow—that Linde allowed liens to be placed on the plant and it abandoned the project—had not occurred. Thus, Linde argues, Arrow has failed to conclusively prove that its September 20 withholding letter was not a prior material breach that excused Linde's obligations thereby precluding the supposed events of default.

Linde further argues that there is some evidence that Arrow materially breached the EPC Agreement first before Linde committed any of the alleged defaults and that, as of that point, Linde was excused from its ongoing obligations under the EPC Agreement. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." (quotation omitted)); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *R3Build Constr. Svcs., LLC v. Drayden*, No. 01-20-00144-CV, 2022 WL 3452436, at *11 (Tex. App.—Houston [1st Dist.] Aug. 18, 2022, no pet.) (mem. op.). The evidence shows that, as of late August 2019, Linde was aware that, after the plant's completion, Arrow had decided to stop payments to Linde. Jangi testified that to process further payments, Linde needed Arrow to increase the purchase order for the plant. He testified that although Linde explained this to Arrow on several occasions, Arrow refused to do so. *Mustang Pipeline*, 134 S.W.3d at 196; *see Patriot Contracting, LLC v. Shelter Prods., Inc.*, 650 S.W.3d 627

54

(Tex. App.—Houston [1st Dist.] 2021, pet. denied) (concluding evidence of subcontract agreement was sufficient to support trial court's finding that general contractor materially breached its contract with subcontractor where general contractor received payment from project but did not pay subcontractor until seven days after it was due under subcontract, and general contractor wholly failed to pay subcontractor funds it received from the second and third payment applications from project); *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 327 (Tex. App.—Houston [14th Dist.] 2021, pet. denied) (concluding jury reasonably could have found that general contractor materially breached contract with subcontractor where it failed to pay subcontractor some or all of retainage withheld for work actually performed through date of termination); *see also* Restatement (Second) of Contracts § 241, cmt. E (recognizing failure to pay amounts owed generally supports determination of materiality). This is some evidence that Arrow materially breached the EPC Agreement first before Linde committed any of the alleged defaults.

## 2. Subcontracts

Next, Arrow contends that the conclusive evidence establishes that Linde engaged subcontractors in violation of the Agreement and, therefore, Linde is not entitled to any payment for its fees.

In support of its argument, Arrow points out that the EPC Agreement distinguishes between Linde's Fixed Costs and Base Costs. The Fixed Fee includes

55

all profit for the Project and all subcontractor mark-ups while Base Costs cover the actual invoiced cost to the contractor and the cost paid by the contractor to approved subcontractors. Arrow argues that to control costs, Linde was required to structure its subcontracts in the same way but failed to do so.[27] Instead, Linde allowed its subcontractors to bundle their profit and actual costs together which prevented Arrow from identifying their actual costs and Linde then billed Arrow for everything. Arrow states that the EPC Agreement contained certain "flow down" provisions which meant that the protections in the Agreement were supposed to "flow down" to the subcontracts.[28] Instead, it argues, Linde made it impossible to honor the contractual distinction between Fixed Fee and Base Costs.

As an example, Arrow argues that Westcon's subcontract allowed it to blend its actual costs and its profits, leaving Arrow with no way to determine how much to reimburse Linde for its actual costs.[29] Arrow also complains that the problematic

---

[27]  Section 2.3 of the EPC Agreement provides: "All contracts with Subcontractors. . . shall be consistent in all material respects with the terms or provisions of this Agreement."

[28]  As an example, Arrow points to Section 2.4(E), under which Linde promised "to use reasonable endeavors" to require its "Major Subcontractors" to agree to "comply with and perform for the benefit of Owner all requirements and obligations of Contractor to Owner under this Agreement."

[29]  According to Arrow, this was problematic for several reasons. First, Westcon's compensation rested largely on "Unit Rates," which set a fixed price per unit of work. The unit rates were not based on Westcon's actual costs but instead were "all-inclusive," containing undisclosed markups for "profit," "taxes," and other elements

pricing structure was compounded by the narrow audit provisions in the Westcon subcontract, specifically, Sections 17.5 and 20.12 stating:

> Contractor shall not be required to provide access to data concerning those of its costs covered by a lump sum, any labor or equipment rates (whether set forth in the CONTRACT or subsequently approved), agreed multipliers, agreed per diems or agreed markups. Agreed rates, multipliers, per diem allowances and markups are not subject to audit except to verify their proper application to the WORK performed."

Arrow argues that due to this provision, Westcon refused to provide Arrow with full cost data about its actual expenditures. Further, Arrow asserts, Westcon was not even required to track the disallowed costs that Linde was barred from passing on to Arrow under the EPC Agreement.

Arrow argues that because the Westcon contract is inconsistent with the Agreement it cannot determine how much Base Costs Linde truly incurred. Arrow points to an email dated August 30, 2019, from Juergen Fuchs, Linde's Head of Contract Management, to Jangi. In it, he expressed his opinion that Crestwood "can make a case" under Article 2.3 of the EPC ["All Contracts with Subcontractors shall be consistent in all material respects with the provisions of the Agreement."] and noted that "[a]s we negotiated a lump sum contract with our subcontractor, we were

---

of the Fixed Fee. Under the EPC Agreement, however, "Subcontractor markups" are part of the Fixed Fee.

not consistent with the provisions of the [EPC] Agreement."[30] Arrow also argues that Linde did not try to prove that all the other subcontracts were consistent with the EPC Agreement, as those subcontracts were neither offered nor admitted at trial, and therefore Linde could not meet its burden to prove that it honored the flow down clauses of the Agreement.

Arrow argues that Linde had an obligation under the EPC Agreement to structure the subcontracts in a way that makes an accurate determination possible. Without evidence that its subcontractors were properly "engaged in accordance with" the flow down clauses, Linde cannot show that Arrow had a duty to cover these subcontractor costs and therefore there is no evidence to support the jury's answer to Question 1.[31]

Linde contends that Arrow failed to conclusively establish that the costs of Linde's subcontractors were not reimbursable because the subcontracts were supposedly inconsistent with the EPC Agreement. In response to Arrow's contention that Linde's allowing its subcontractors to blend their actual costs and profits together violated Sections 2.3 and 2.4(F) of the EPC Agreement, Linde argues that Arrow cannot overcome the dispositive effect of Section 6.1 of Schedule C-1, Table

---

[30]    At trial, Jangi testified that Linde did not negotiate a lump sum contract with Westcon but rather the subcontract was a "reimbursable/target price" contract.

[31]    Question 1 asked: "Did Arrow fail to comply with the EPC Agreement by failing to pay Linde for Base Costs that Linde incurred?"

6, "Cost Allocation Table": "Fees and expenses of Subcontractors performing a portion of the Work" are included in Base Costs. Linde points to the "Notes to Table C-1" which state that "the general descriptions set forth in Table C-1 shall control over any other conflicting provisions of the Agreement." Thus, Linde reasons, Section 6.1 which defines subcontractor fees and expenses as reimbursable Base Costs controls over any conflicting provision in the EPC Agreement.

In response to Arrow's argument that (1) Schedule C-1 § 6.1 is limited by Schedule C-1 § 3.1's provision that the EPC Agreement's "Fixed Fee shall be inclusive of . . . all subcontractor mark-ups," (2) Schedule C-1 § 5.2's provision that subcontractors must be "engaged in accordance with Sections 2.3 and 2.4," and (3) Schedule C-1 § 6.2(c)'s provision that Disallowed Costs include "any cost that . . . include[s] profit and/or an element of Fixed Fee," Linde asserts that Arrow has failed to conclusively show that there was no conflict between these provisions, and that the general description in Table C-1 § 6.1 would not control. Linde contends that the jury would also have been within its rights to conclude that the provisions in Schedule C-1 §§ 3.1, 5.2, and 6.2(c) upon which Arrow relies conflicted with Table C-1 §6.1's statement that "Fees and expenses of Subcontractors performing a portion of the Work" are included in Base Costs.

Linde further argues that, in any case, Arrow failed to conclusively prove that

59

Schedule C-1 § 3.1 ("Fixed Fee shall be inclusive of . . . all subcontractor mark-ups") and § 6.2(c) (Disallowed Costs include "any cost that . . . include[s] profit and/or an element of Fixed Fee") actually dealt with subcontractors' profits and did not instead mean that Linde could not add a mark-up for itself on the subcontractor invoices it paid and that Linde could not include its own profit or an element of the Fixed Fee as reimbursable Base Costs.

In response to Arrow's contention that Linde's costs were not reimbursable because Arrow could not audit Westcon about Westcon's mark-ups, Linde argues that the EPC Agreement does not require this type of audit to verify that Linde's costs paid to subcontractors were reimbursable Base Costs.

Linde also argues that Section 2.3 does not say that Linde's subcontracts with the subcontractors needed to be identical to the EPC Agreement. Instead, it said the subcontracts were to be "consistent in all material respects with" the EPC Agreement. It asserts that Arrow has not conclusively proven that the Westcon subcontract, which is a "target price agreement," is inconsistent with the EPC Agreement, and that the parties could have intended that "consistent" meant not directly in conflict or mutually exclusive. Linde further argues that Arrow has not conclusively proven that Linde did not "use reasonable endeavors" to get Westcon to agree to "comply with and perform for the benefit of Owner all requirements and obligations of Contractor to Owner under [the EPC] Agreement," nor has it cited

any evidence regarding Linde and Westcon's negotiation of the subcontract. Thus, it argues, the jury was within its discretion when it answered in Question 8(b) that Linde did not "fail to comply with the Subcontracts provisions in Section 2.3 or 2.4(F) of the EPC Agreement."

Linde further argues that contrary to Arrow's assertion, Linde was not required to submit into evidence subcontracts, other than the Westcon subcontract, to show its entitlement to Base Costs for subcontractor costs. Linde points out that Question 8 put the burden on Arrow to show that Linde failed to comply with Section 2.3 or Section 2.4(F), so Arrow had the burden to admit those subcontracts and conclusively establish they violated those sections of the EPC Agreement.

Linde argues that Arrow also effectively waived any complaint about the Westcon subcontract because Linde gave the subcontract to Arrow right away, Arrow and Linde met about it and reviewed it, Linde fixed the only complaint Arrow had, Phillips testified that he would expect Arrow to advise Linde of any complaint and Arrow did not do so until after the plant was completed, and Arrow was looking for a reason not to pay Linde.

Finally, Linde argues that Arrow would still lose even if it could conclusively prove that Linde failed to comply with the EPC Agreement. According to Linde, Arrow's only remedy for that failure, due to how the jury charge was structured, is a new trial, a remedy that Arrow expressly waived. Question 9 asked whether any

61

failure to comply by Linde was excused, but the jury did not answer it because it was predicated on a "yes" answer to some or all of Question 8. Because Arrow has not raised an argument that would preclude a jury finding on excuse, a new trial would be required to resolve this issue. As Arrow has expressly waived the relief of a new trial, Arrow cannot obtain any relief based on its arguments that its failure to pay Linde's Base Costs was excused by Linde's alleged defaults or the alleged inconsistency of the Westcon subcontract with the EPC Agreement.

### 3. "Reasonably and Properly Incurred"

Arrow argues that there is no evidence that any unpaid Base Costs were "reasonably and properly incurred for the sole purpose of carrying out the Work."

Section 5.1 of Schedule C-1 of the EPC Agreement sets out a two-part test for reimbursement:

> **5.1 Generally.** Contractor shall only be entitled to be paid for the Base Cost incurred in the course of carrying out the Work under this Agreement *if* those disbursements:
>
> (a) have been actually, reasonably and properly incurred for the sole purpose of carrying out the Work; and
>
> (b) are enumerated as Base Costs in accordance with Schedule C-2 and as further clarified in Table C-1.

Arrow argues that Linde's witnesses focused almost exclusively on subpart (b) and that the testimony of Linde's expert witness, Bryan Byrd, and Jangi, did not satisfy

62

subpart (a) requiring that unpaid Base Costs were "reasonably and properly incurred for the sole purpose of carrying out the Work."

### a. Standard of Review

For an expert's testimony to be admissible, the expert witness must be qualified to testify about "scientific, technical, or other specialized knowledge," TEX. R. EVID. 702, and the testimony must be relevant and based upon a reliable foundation. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002). An expert's testimony is relevant when it assists the jury in determining an issue or in understanding other evidence. TEX. R. EVID. 702. Testimony based on an unreliable foundation or flawed methodology is unreliable and does not satisfy Rule 702's relevancy requirement. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556–57 (Tex. 1995) (discussing TEX. R. EVID. 702). Expert testimony is unreliable when "'there is simply too great an analytical gap between the data and the opinion proffered[,]'" *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007), or if it is not grounded in scientific methods and procedures but is rather based upon subjective belief or unsupported speculation. *See Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). We review the admission of expert testimony under an abuse of discretion standard. *See TXI Transp.*, 306 S.W.3d at 239.

**b. Byrd's expert testimony**

Arrow contends that Byrd's expert testimony was unreliable and therefore inadmissible for several reasons. First, it contends that Byrd's opinion about the propriety of Linde's billed costs was based on nothing than more than his feelings and pure ipse dixit. In support of its position, it points to the following excerpts from Byrd's deposition testimony: "So I feel like I did an exhaustive review of the project records as I identified costs," and that he gave his own "judgment as to what I believe from an industry viewpoint should be—or was properly billed and should be paid and what wasn't." Second, it argues that Byrd never provided any reliable basis for demonstrating whether costs were "reasonably and properly incurred." Arrow argues that Byrd did not even try to explain why the Base Costs were incurred for the "sole purpose" of the work. Instead, Byrd simply proclaimed them to be so. Third, Arrow asserts that Byrd mistakenly assumed that if costs were actually incurred and among the enumerated categories of costs then they also satisfied the "reasonably and properly incurred" and "sole purpose" tests. Arrow points to the following testimony by Byrd to make its point:

> So, by definition, if I state that it's a base cost, it is a cost that I found through a detailed review of all of the cost records and all of the invoices and numerous other types of project documents, that was actually, reasonably, properly incurred for the sole purpose of performing the work.

Next, Arrow argues that even is his opinion was admissible, his trial testimony was facially speculative and conclusory. It asserts that Byrd's testimony about whether costs were actually incurred, among the categories of Base Costs, or among the disallowed costs, provided no basis for his opinion that the costs were "reasonably and properly incurred for the sole purpose of carrying out the Work." And, it argues, Byrd's assumption that if a charge had been improper either Linde or Arrow would have caught it because the costs "were being monitored and managed all the way through by a number of eyeballs" is baseless.

At trial, Byrd testified that his opinions were based on his twenty-five years' experience in the construction industry, including significant experience with processing facilities, and that he had worked on half a dozen natural gas plants like the Bear Den II plant. He testified that he has substantial experience with EPC projects both in the United States and overseas and has been heavily involved in fast-track projects. Byrd has been hired to do cost controls, cost estimating, risk analysis, project controls, and has been involved as a project management representative. He testified that he has forensically analyzed costs on EPC projects numerous times, including cost reimbursable contracts with a target price like the one in this case. He has experience analyzing performance-related costs such as labor productivity, delays, acceleration, rework, change order work, and other types of costs.

When asked how he "confirm[ed] that Linde's costs were actually, reasonably, and properly incurred for the sole purpose of carrying out the work," Byrd testified that in addition to the invoices and back-up documentation, he interviewed Linde employees, reviewed Linde's internal cost accounting system, or SAP, and relied on the provisions of the EPC Agreement. He explained that the Base Cost is set forth in Table C-1 of the contract and that there is also a provision addressing disallowed costs. Using these provisions as a guide as well as his industry experience on similar projects, Byrd testified that he performed a detailed analysis of the project records and determined what he believed was the Base Cost of the contract. This entailed "looking at the nature of the costs, how they were incurred, the magnitude of the cost, confirming . . . what types of costs they were, that they were incurred on this project in the advancement of the project." He also evaluated the process that was followed in executing the project and how it was managed. He explained that the costs being incurred were monitored at different levels throughout the project, including project superintendents and subcontract managers as well as Crestwood's project manager and other personnel. He testified about specific instances where he excluded costs because they were not supported by the documentation. Byrd's testimony provided a reliable basis for determining whether costs were "reasonably and properly incurred for the sole purpose of carrying out the work," and his testimony was not unduly speculative or conclusory in this regard. The trial court

66

did not abuse its discretion in admitting his testimony. *See TXI Transp.*, 306 S.W.3d at 239; *Coastal Transp.*, 136 S.W.3d at 232.

### c. Jangi's testimony

Arrow also contends that Jangi's testimony did not "fill the gap" left by Byrd and cannot support the judgment for two reasons. It argues that the rules of evidence bar Jangi's unsupported lay opinion from being given any weight.

First, Arrow argues that Jangi's testimony that Linde complied with Section 5.1 of the EPC Agreement should have been excluded because he lacked personal knowledge regarding all the alleged Base Costs and could not testify about whether Linde's invoices satisfied Section 5.1. Second, Arrow argues that even if his testimony was admissible, it is facially incompetent because Jangi's legal conclusions that the charges were "reasonably and properly incurred for the sole purpose of carrying out the Work" are insufficient to demonstrate that any of the unpaid costs satisfy the reimbursement test under Section. 5.1.[32]

The record shows that Jangi testified over several days about Linde's work on the project. As Linde's Director of Project Execution, Jangi reviewed the status of the Bear Den II project monthly. He testified about the costs Linde incurred, the invoices that Linde sent to Arrow, and Linde's cost reports. He testified about

---

[32] At a gatekeeping hearing, the trial court prohibited Jangi from testifying that the costs were "reasonable and necessary."

Arrow's project change orders and the significant impact those changes had on costs. He also testified about the policies and procedures Linde implemented on the project to ensure the costs Linde invoiced to Arrow were reimbursable Base Costs. Contrary to Arrow's assertion, Jangi's testimony was based on his experience and was not improper expert testimony that failed to "fill the gap," and the jury was entitled to weigh his testimony as it saw fit. *See City of Keller*, 168 S.W.3d at 819 (Jurors "are the sole judges of the credibility of the witnesses and the weight to give their testimony."). We overrule Arrow's second issue.

### Prejudgment Interest

In its third issue, Arrow contends that even if the PPA applies to the parties' agreement, the jury's award of $17.6 million in prejudgment interest to Linde should be reversed or reformed based on (a) Linde's uncured defaults or (b) the trial court's acceptance of a post-trial interest calculation unsupported by any jury finding.

Because the PPA does not apply for the reasons discussed above, Linde cannot recover the $17,683,501 awarded in the final judgment as prejudgment interest based on Linde's claim for unpaid Base Costs under the PPA. *See* TEX. PROP. CODE § 28.004(a) (allowing interest on "[a]n unpaid amount"). We therefore do not consider Arrow's third issue challenging the prejudgment interest awarded to Linde.

68

## Safety Incentive Award

In its fourth issue, Arrow contends that Linde never achieved "Final Completion" of the Bear Den II plant under the EPC Agreement and did not invoice Arrow for the EPC Agreement's Safety Incentive. Thus, Arrow asserts, it is entitled to reversal of the award.

The trial court awarded $729,379 based on Arrow's "failure to comply with the [Agreement] by not paying Linde the Safety Incentive set out in Section 3.1 of Schedule C-3 of the Agreement." The Safety Incentive allowed Linde to recover a larger Fixed Fee if it met certain safety criteria "upon Final Completion." Under the EPC Agreement, "'Final Completion' means that all Work and all other obligations under the Agreement for the Project . . . are fully and completely performed in accordance with the terms of this Agreement . . . ." The definition also includes a list of tasks that must be performed prior to Final Completion, many of which Arrow asserts that Linde failed to prove, among them:

> • "delivery by Contractor to Owner of all documentation required to be delivered under this Agreement, including Record As-Built Drawings."
>
> • "removal from Site of all of Contractor's . . . waste, materials, rubbish, [and] Hazardous Materials."
>
> • "the completion of all Punchlist items."
>
> • "delivery by Contractor to Owner of fully executed Final Lien and Claim Waivers."

- "delivery by Contractor to Owner of a Final Completion Certificate. . .which Owner has accepted."

Arrow asserts that it is undisputed that Linde ordered its engineers not to provide as-built drawings, burdened the facility with a lien that is still pending, and never submitted a "final completion certificate." Thus, it argues there is no evidence that the project reached "Final Completion" entitling Linde to the Safety Incentive. It also argues that there is no evidence that Linde invoiced Arrow for the Safety Incentive and that it is not obligated to pay sums in the abstract.

In response, Linde points to the EPC Agreement's Safety Incentive provision which provided that Linde would be entitled to an additional Fixed Fee amount if the project met certain safety metrics.[33] The record shows that Linde satisfied these requirements. And, as to Arrow's argument that "Final Completion" was not reached, the jury heard testimony that it was impossible to obtain "Final

---

[33] Schedule C-3, Section 3.1 states:

The parties agree the following safety incentive program shall apply to the Project: If upon Final Completion, Contractor and Subcontractors and Sub-subcontractors combined have (i) a Total Recordable Incident Rate of less than or equal to **1.4**, (ii) a Lost Time Case Rate of less than or equal to **0.67, and** (iii) zero fatalities, then the fixed Fee shall be increased by an amount equal to one percent (1%) of the Target Base Cost.

Completion" because Arrow had wrongfully withheld certification of "Mechanical Completion," which was a prerequisite to "Final Completion."[34]

Linde also asserts that it was within the jury's discretion to reject Arrow's argument that Linde was required to invoice it for the Safety Incentive. We agree. As Linde points out, Section 7.1 of the EPC Agreement, which states that the "Fixed Fee shall be payable in each invoice," makes no mention of the Safety Incentive. We overrule Arrow's fourth issue.

## Modification of Final Judgment

In its fifth issue, Arrow contends that because Linde's PPA claim fails, the final judgment should be modified by deleting the award of attorney's fees and costs and recalculating the prejudgment interest at the contract rate.

The final judgment awarded Linde $4,616,760 in attorney's fees and $130,568 as costs based on the PPA. Because we have concluded that Linde's PPA claim fails, Linde was not entitled to recover the $4,616,760 awarded as attorney's fees[35] and the $130,568 awarded as costs based on the PPA.

---

[34]  McFarland testified that all major systems at the Bear Den II Plant were mechanically complete on August 1, 2019, and that Crestwood had refused to certify the Mechanical Completion certificate submitted by Linde for signature.

[35]  Linde sought fees "under section 38.001 of the Civil Practice and Remedies Code." However, the applicable version of Chapter 38 "does not authorize the recovery of attorney's fees in a breach-of-contract action against a limited liability company." *Composite Solutions, LLC v. Composite Advanced Techs. LLC*, No. 01-20-00413-CV, 2021 WL 4095249, at *2 & n.1 (Tex. App.—Houston [1st Dist.] Sept. 9, 2021, no pet.) (mem. op.); *see also TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d

Further, because the PPA does not apply, prejudgment interest must be recalculated. The EPC Agreement provides for the accrual of interest on "amounts due but not paid . . . at the lesser of" the prime rate +2% or "the maximum rate permitted under Applicable Law." Under that provision, the applicable interest rate is the statutory rate for post-judgment interest. *See* TEX. FIN. CODE § 304.003(a), (c)(1); *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *24 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. denied) (holding, as matter of law and equity, that "[w]hen the interest rate is not specified in a contract, pre-judgment interest should be calculated based on the statutory rate" in § 304.003) (citing *ExxonMobil Corp. v. Valence Op. Co.*, 174 S.W.3d 303, 319 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (applying section 304.003 in breach of contract claim)). Although Section 304.003 expressly applies to *post*-judgment rates, pre-judgment interest is computed at the same statutory rate. *See Tennessee Gas Pipeline*, 2008 WL 3876141, at *24 (citing *Tips v. Hartland Developers, Inc.*, 961 S.W.2d 618, 624 (Tex. App.—San Antonio 1998, no pet.). Accordingly, we modify the final judgment to delete the awards of $4,616,760 in attorney's fees and $130,568 as costs based on the PPA. We remand

---

176, 188 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). At oral argument, Linde conceded that the PPA is the only basis upon which it could recover attorney's fees.

the case to the trial court to recalculate the prejudgment interest at the proper rate. We sustain Arrow's fifth issue.

In summary, we conclude that the exemptions under Subsections (a)(1) and (a)(3) of Section 28.010 of the Prompt Payment Act apply as a matter of law to the EPC Agreement and that the PPA therefore does not apply. Because Linde's PPA claim fails, it cannot recover the $4,616,760 awarded as attorney's fees, the $130,568 awarded as costs, and the $17,683,501 awarded as prejudgment interest under the PPA, and the 18% prejudgment interest must be recalculated at the proper rate. Finally, we conclude that there is legally sufficient evidence to support the jury's verdict on Linde's breach of contract claim for unpaid costs and the award of a $729,000 Safety Incentive to Linde.

## Conclusion

We reverse the portion of the final judgment awarding $17,683,501 as prejudgment interest, $4,616,760 as attorney's fees, and $130,568 as costs to Linde under the Prompt Pay Act and render judgment that Linde take nothing on its PPA claim. We remand the case to the trial court to recalculate interest at the proper rate as provided by the parties' agreement. We affirm the final judgment in all other respects.

Amparo Monique Guerra
Justice

Panel consists of Chief Justice Adams and Justices Goodman and Guerra.

73